## Mayer v. Mayer, Appellant.

Argued October 4, 1938.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker and Rhodes, JJ.

*R. Levi,* with him *Joseph L. Fox,* for appellant.

*Nathan Kessler,* for appellee.

Opinion by Stadtfeld, J., October 28, 1938:

This case involves an action for divorce a vinculo matrimonii, brought by Morris Mayer, libellant, against

his wife, Mattie Mayer. The libel alleged as grounds for divorce (1) cruel and barbarous treatment endangering his life; (2) indignities to his person such as to render his condition intolerable and life burdensome; (3) desertion. The master, before whom the case was heard, recommended a divorce on the second ground alone. The report of the master having been approved, the court below entered a final decree which is assigned as error.

Where, in an action for divorce, the issues of fact have been determined by a jury, it is the duty of this court on appeal, to examine the testimony for the purpose of ascertaining whether there is sufficient evidence to support the verdict; *King v. King,* 113 Pa. Superior Ct. 285, 173 A. 432; *Rinoldo v. Rinoldo,* 125 Pa. Superior Ct. 323, 189 A. 566. Where, however, as in this case, the action is heard before a master, the extent of our review is not so limited. We are, then, required to consider the evidence de novo, pass upon its weight and upon the credibility of witnesses, and reach an independent conclusion upon the merits as to whether a legal cause for divorce has been well established: *Huston v. Huston,* 130 Pa. Superior Ct. 501, 197 A. 774.

The burden is upon the libellant to prove his case by clear and satisfactory evidence, and there must be a preponderance of the evidence in his favor: *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69; *Rinoldo v. Rinoldo,* supra.

Morris Mayer and Mattie Mayer were married on January 27, 1931. Libellant was a widower at the time of this marriage and had two children by a former wife—Irving Mayer, eleven years of age and Marcelle Mayer, five years of age. Three years after this marriage, a child, Bertha Mayer, was born to libellant and respondent.

The testimony of the husband and his witnesses, if credited, establish the facts that the serious trouble

between the parties, beginning shortly after the first year of their marriage, involved her language, her actions, and her conduct toward him and his children; that she continually used profane and abusive language in addressing them and in their presence; that often she resorted to personal violence, assaulting and threatening to kill libellant and his children; that she, on numerous occasions, mistreated the children, handling them in a violent manner, refusing them food, and denying them proper meals when given the means of providing for them.

Time and time again, respondent cursed and swore at libellant, calling him vile names. Repeatedly, she ordered libellant and his children to "get the hell out of the kitchen and stay out." She menacingly followed these orders with threats to kill, or sharply reinforced them with a flying missile, such as a cup, a plate, or a heavy metal ash tray. A large bread knife with a twelve-inch blade wielded in pursuit often effected swift execution of her orders. Upon one occasion, a well directed baby's milk bottle drew blood from libellant's nose.

Libellant, however, was not the sole object of respondent's attacks. According to the testimony of libellant's daughter, Marcelle, respondent often struck Irving, libellant's son, and on one occasion, threw a knife at him which stuck in the wall. She told of the black and blue marks on her person as a result of respondent's pinching her a number of times, and of being threatened with death if she complained of mistreatment to her father. She corroborated libellant's testimony as to respondent's use of profane words and her throwing of the ash tray.

Libellant's son, Irving, corroborated his father's testimony, stating that respondent was always cursing, punishing his sister, Marcelle, and threatening to kill them. He also corroborated libellant on the incidents regarding the milk bottle, ash tray, and bread

knife, and the chasing of libellant by respondent with threats to kill. He further testified that when he was ill with appendicitis in 1932, respondent swore at him, called him a brat, and told him to go to school as she did not want anyone sick on her hands. He also recounted the following incident. When recuperating in bed from his appendicitis operation, respondent struck him over the incision with a shoe.

A neighbor, James H. Wardle, testified that he had invited Marcelle into his house when the child was left outdoors by respondent, and corroborated libellant's testimony as to the loud cursing of respondent.

Another neighbor, Clarence Lewis Comly, testified that he had seen respondent strike the boy, Irving, with a broom on one occasion; that he had seen respondent take the little girl, Marcelle, off the back step, lifting her completely by one arm and taking her into the house; that he had seen both Irving and Marcelle being struck by respondent; and that respondent's profanity occurred so often that he really couldn't count the number of occasions she used it.

Respondent in her testimony, denied generally the testimony of the libellant and denied that she used any profanity whatsoever. Respondent's testimony was uncertain and contradictory in certain respects.

The only witness offered on behalf of respondent was her brother, whose testimony was in the greater part immaterial. He had visited the Mayers only four or five times during the course of the parties' married life.

Libellant has, in our opinion, met the burden of proving his case by a preponderance of clear and satisfactory evidence. We conclude that respondent, by a continuous course of conduct toward libellant and his children, has rendered his condition intolerable and life burdensome. Respondent plainly manifested by words and deeds, a well settled hate. Although libellant's testimony was largely contradicted by respond-

ent, it was strongly corroborated by the testimony of his children and by disinterested witnesses. Respondent's testimony, on the other hand, was practically uncorroborated.

"It has been repeatedly stated that 'it is impossible to lay down a general rule for the determination of what indignities render the condition of the injured party intolerable. It has been held by many courts (see 14 Cyc. 623) that they may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient' ": *Sharp v. Sharp*, 106 Pa. Superior Ct. 33, at p. 35, 161 A. 453, at p. 454. See, also, *Rinoldo v. Rinoldo*, supra.

The case of *Picciano v. Picciano*, 110 Pa. Superior Ct. 189, 168 A. 488, is particularly pertinent to the present case. In that case, this court, holding that the abuse of stepchildren by a stepmother, constitutes an indignity to the person of the father, stated at p. 195: "It is true that indignities to a step-child might not constitute indignities to the person of the husband. Here, however, a family relationship existed where it was necessary to rear his children by a former marriage with two other sets of children in one household, and his children, we are forced to believe, were submitted to cruel and barbarous treatment to the knowledge of such husband. It is idle to suggest that this does not constitute an indignity to the husband. We cannot imagine a course of conduct that would be more unbearable, intolerable, and injurious to the health of a husband, a working man of comparatively limited means, than to be compelled to live in a household where his young children were submitted to the treatment that was accorded these children. In fact, the conditions would have been more tolerable if the out-

bursts of temper had been directed toward the husband. The Commonwealth has an interest in the maintenance of the family relationship and the rearing of children in an atmosphere conducive to their welfare. This is the primary reason for the interest of the state in all divorce proceedings. We are convinced that the treatment of these children by the wife was an indignity toward the husband."

Having carefully reviewed all the evidence, we have reached the conclusion that the decree should be affirmed.

Decree affirmed.