Grasso *v.* Grasso, Appellant.

Argued November 13, 1940.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, Rhodes and Hirt, JJ.

*Samuel Kagle,* with him *George C. Klauder,* for appellant.

*Charles A. Rothman,* for appellee.

OPINION BY STADTFELD, J., January 30, 1941:

This action in divorce was instituted on March 28, 1935 and in his libel, libellant charged, (a) cruel and barbarous treatment, (b) desertion, (c) indignities to the person. The master, after hearings were held, recommended a dismissal of the charges of cruel and barbarous treatment and desertion, but recommended that a decree be granted on the charge of indignities to the person. The master's report was approved by the court, and a final decree in divorce a.v.m. was entered. This appeal followed.

The parties to this action were married on April 27, 1907 in Catonia, Sicily, in the Kingdom of Italy. They lived together in Italy for about eighteen months, during which time a son, Michael, was born. In May of 1910, the husband came to this country and established a home in Philadelphia. About eight months later the wife and infant son joined the libellant in Philadelphia and from that time until the present they continued to live in Philadelphia. There were three children born of the marriage, Michael, now 32 years old, and Sarah and John, twin children, who are 25 years old. These children lived at home during the entire period the parents lived in cohabitation.

In October or November 1928 libellant packed his belongings and left the family home. Since that time the parties have lived separate and apart. A short time following the separation, in December of 1928, the wife, charging desertion on the part of libellant, made application for support at the Domestic Relations Court

and a weekly order of $25 was granted by the court. It was reduced from time to time and on several occasions, libellant was imprisoned for failure to comply with the order of court.

Libellant's testimony in support of the charges set forth in the libel and the averments in his bill of particulars, briefly condensed, were: That when he returned home after the marriage ceremony he discovered that his wife was not a virgin; that he forgave her in the sense that he just forgot about it; that while his wife was in Italy he learned from relatives that two men were entering and leaving his wife's house from time to time but she denied his accusations when he told her about it; that they quarreled almost every week and that she called him vile and approbrious names; that when he would say something to her, her temper would rise and that she would call him names and abuse him and start to throw dishes and order him out of the house using insulting language; that this mode of conduct began a couple of years after she came to this country; that the serious troubles began when his wife went back to Italy in 1927; that the trouble in 1927 started on account of financial matters; that his wife did write to him but that they were nasty letters; that he was angry because of her transmitting money to Europe without his knowledge; that in November of 1927 he went to New York to meet his wife and children upon their arrival from Italy and that when he attempted to embrace his wife she pushed him away; they left together and came home by train but his wife would not converse with him; that the day following her return from Italy, he left $20 on a table to buy food, but she tore it up; that he took the torn pieces and put them in his pocket and he did not give her any money for fifteen days, during which she did not cook or wash; that his wife then went to the municipal court and when the judge saw them together, he dismissed the case—this was during November or December of 1927;

that when he got home from court, his wife was already there and she ordered him out of the house—she had an ice pick in her hand and threatened to bore holes in his stomach with the ice pick; he took the ice pick from her hand and she then opened a drawer and took out a revolver; that he took the revolver from her and then his oldest son held his arms and his wife struck him over the head with a chair; that she threatened to shoot him with a revolver if he did not leave the house; that he immediately complained to the municipal court and to the police station and they advised him to stay away from the house; that he did return that night and while he was in bed, trying to get some sleep, his wife called him abusive names but he did not retort; this continued for three hours and about eleven o'clock in the evening, he left; that his bedroom was separate from that of his wife; that when he did not pay the support order, the judge gave him six months and while they were before the judge she called him a "dumb bastard" and told him to go to prison and break stones; that he was released when the arrears were paid up; that in 1916 or 1917 he had a dispute with his wife because she wanted some money to go to Atlantic City, and he finally told her to go; that while she was gone he received a letter from a bank addressed to his wife concerning money which had been sent to Italy; that he searched the house for bank books but did not find any, but he found $1,300 in three different places under the carpet on the floor; that he put the money back and did not tell his wife about finding the money but when she returned, she noticed that the money had been touched and when he spoke to her about it she told him that it was her money and not his and that it was none of his business; that she used insulting language while addressing him, but he did not talk to her about that matter any more; that after an argument, they did not speak to each other for two or three or four months and that he was always the one who made

peace; that in 1918, while his wife was in the hospital, she intrusted a package with a Mrs. Filippino; that his wife received night and day telephone calls during the years 1914 and 1916—the calls coming in at midnight and other early hours of the morning; that she would leave the house for a couple of hours and that when he questioned her about the errands, she said that she was helping a little baby that was sick; that women were seen in the house talking with his wife; that he told his wife he did not want those women to come in and she rented a room in a house on 9th Street and got arrested for acting as a midwife; that they had saved $1,000 and that his wife took the money to defend herself in the case; that when he learned about the arrest, he became very angry and he and his wife did not speak for five or six months after that; that at the time of the knife, revolver and blackjack incident, the children were not present but they were downstairs; that on the night he left, they were in the house and he left an address where he went to live; that he walked out of the house and the children did not say anything to him. Libellant introduced the record of a criminal proceeding wherein respondent was charged with abortion in 1925. The record shows that respondent was acquitted by direction of the court.

Libellant called a number of witnesses on his behalf. Frank Pasquerello, a witness for appellant, testified that he was a division committeeman where libellant lived; that he attempted to effect a reconciliation shortly after separation; that respondent called libellant vile names and accused libellant of having a venereal disease. Under cross-examination, the witness said he visited libellant several times a week, was very friendly with him and later stated that he saw libellant every day. He also stated that Mrs. Grasso's statements did not influence his esteem for the libellant. Philippo Zappala, called as a witness by the libellant, testified that he attempted to effect a reconciliation

in 1928 and that respondent said that libellant was no good any longer and that he is only good to deal in wood and that he does not satisfy her. Another witness, Domencia Pilippini, testified briefly that in 1920 when the respondent went to the hospital, she intrusted a bag with her with instructions to give it to the children if she died but to return it to her if she lived.

As a rebuttal witness, the libellant called Frances Tagrino, who stated that she lived with her husband in the Grasso home but denied that there was any improper relations between her and libellant. She stated that both libellant and respondent received knife wounds during an altercation in which she, her husband, libellant and respondent were involved.

Libellant called Francesco Luizzi, his wife Natalina and his brother, Pasquale. Their testimony was generally to the same effect, that they were altering the Grasso home in 1923; that numerous "strange women" were seen going to and leaving the house; that respondent admitted to them that she was performing abortions—that she admitted committing the crime for which she was charged in the abortion proceedings; that when libellant objected to her conduct regarding these women, respondent insulted him. Natalina testified that respondent admitted to her that she performed abortions and offered to perform an abortion on her, but as she did not believe in them, she refused. On cross-examination, the witnesses admitted that although they were friendly with libellant, they repeatedly refused to appear as his witnesses when libellant asked them to but they were induced to come when Mr. Lynch, the libellant's attorney, whom they did not know before, personally called to see them three or four times. Francesco testified he decided to testify as a witness when he heard that the children testified against their father, but later testified he agreed to be a witness because the attorney's method of approach induced him.

Libellant called Rosario DiBartolo, who testified re-

garding certain incidents in Italy between himself and the respondent and on their coming to America. His testimony tended to prove that the respondent made overtures to the witness to become her lover and go to South America with her. However, on cross-examination, he denied there was anything improper between them.

On behalf of the appellant, it is contended that: 1. the husband has failed to establish his charge of indignities to the person with the quantity and quality of testimony required under the laws; 2. that the alleged indignities upon which he relies were provoked by his own violent and improper conduct; and 3. that the learned court below did not apply the proper measure of proof in a divorce action.

Libellant's testimony was categorically denied by the respondent; but her testimony was in many important matters so self-contradictory and her statements as to other matters so extravagant and unbelievable, that taking her testimony in its entirety, it lacks credibility and therefore has no probative value to overcome the testimony of libellant and his witnesses. She persisted in accusing him of improper relations with "thousands" of women; and of having venereal diseases which he transmitted to her. In every instance, although she categorically denied the truth of libellant's testimony, and made serious counter-charges, she failed to produce any corroboration of her accusations against him, but at the hearings before the master in her testimony she persisted in her allegations that he ran around with "thousands" of "bad women" and that he had venereal diseases which he transmitted to her. These, obviously, were matters readily susceptible of corroboration, if they were true, yet she failed to produce as witnesses any of the doctors who were alleged to have treated her. She failed to produce the readily available records of the Pennsylvania Hospital where she claimed to have been treated. She made vague reference to various

physicians, yet when pressed for details, did not know their addresses nor did she explain her failure to produce them at the hearings. She admitted accusing libellant of running around with "bad women," including one who lived directly across the street of their home, but when questioned as to their identity, she referred vaguely to them by first names, "Stella, Frances, Marguerite, May, etc." She accused her husband of relations with one Frances Tagrino, a married woman, who resided in the same house, and, at the hearings, persisted in her charges. Here, having first testified she caught him in bed with this woman, she then changed her story and said she merely found him in a room with her. Libellant, however, procured Mrs. Tagrino as a witness, who angrily denied the respondent's charges. Respondent said that libellant constantly beat the children. How much credit can she be given in this, when Michael, the oldest child, who she said received such a beating, did not recall it? She testified that they quarreled constantly. The son, Michael, said that most of such quarrels were over money. The libellant testified that he always gave money to his wife, and that he supported his family to the best of his ability. The respondent took two trips to Italy. On the last trip, she took the children with her, and she does not deny that her husband supplied the funds for the trip. She repeatedly testified that the libellant never supported her or gave her any money, and that she had to support herself and the children. This her own witnesses denied and said that she never worked or had any other income. Respondent admitted that she quarreled constantly with the libellant, but blamed it on money troubles. Here, again, was another example of her reckless over-statements, when she said, in reference to her husband: "He never gave me a penny, never bought me a pair of shoes, never did." Sarah, her daughter, stated that her mother never worked. Respondent's witness, Michael Grasso, too,

testified: "Q. Did your mother ever work at any time that you remember? A. Work. Q. Yes. A. No, sir. Q. Did she have any source of income that you know of? A. No, sir, nothing definite." Michael further testified that he went to public school, private school, spent a year at a medical college and that his father was the only wage earner in the family. Hence, there was but one conclusion for the court below and the master to draw, that the respondent's testimony in this respect was untrue, and that libellant did support, maintain and educate his family to the best of his ability.

Respondent made counter-charges, stating that libellant beat her up and inflicted serious injuries upon her. We quote from her testimony: "Q. What were the circumstances of that incident? A. The boy was upstairs washing his face and at that time we had a candy store downstairs, an ice cream store and lemonade. When he found the boy upstairs, he hit him in the head and the boy was stunned from the blow. I said to him, 'You're killing the boy.' He left the boy and started to beat me. Q. He beat you? A. Yes. He beat me in the jaws, which necessitated my staying in bed *for forty days.* I was unable to open my mouth. By the Master: Q. You were in bed how long? A. Forty days. Each jaw was broken. Q. Did you see a doctor? A. No." Again, she alleges that he struck her and blackened her eye which she had, too, *for forty days,* and again she testified: "Q. Mrs. Grasso, you testified that your husband Mr. Grasso broke your jaw, how many times, once or twice? A. Twice. Q. Did he break both jaws each time? A. Once he broke both jaw bones, and the second time he just broke one side of my jaw, which necessitated my being unable to move my mouth *for forty days.* Q. When did that happen the second time? A. A month or two after the first time."

The master was amply warranted in refusing to believe this incredible story, particularly in view of her

failure to get medical attention for injuries so serious and painful. Just as ridiculous was her contention that every injury she received lasted forty days; that her husband abandoned her for forty days, and that they had no sexual relations for forty days. With respect to other alleged injuries, she said medical treatment was obtained, but no attempt was made to prove this, nor was she able to adequately identify the doctors who treated her.

The three principal witnesses for the respondent were her children, Sarah, John and Michael. Sarah was the first to testify. She testified that her father left their home in 1927, which would make her about ten years old at that time. She testified there was no quarrel at that time and that her father did not speak to her mother for two weeks before he left. She further testified that she saw her father strike the respondent one evening, and in answer to a direct question gave her age as fourteen at the time the alleged incident occurred. She stated her parents separated in 1926, which would make it impossible for her to have been fourteen, as she was about twenty-one at the time of the hearings. What she apparently was trying to do was impress the master with the fact she was old enough to have full weight and credence accorded her testimony. The vividness with which she described the various incidents should be compared with the testimony of her older brother, Michael, who, in all frankness, admits that these incidents were not clear to him. At one place, the witness testified her parents separated in 1929, which would make her fourteen years of age. At another place, she said that they were separated for about six years and later, she said that she was fifteen years old when they separated. These discrepancies compel the conclusion that any other dates given by her must be considered with caution. She said that her parents constantly quarreled and that her father

always started these quarrels although her brother, Michael, who was much older, stated that both seemed to start these quarrels. She admitted that her name was Santina and said that her mother was the owner of the property located at 6341 Dicks Avenue. She said she did not know if her mother owned any real estate. These contradictions indicate that she was not telling the truth and that she was trying to conceal facts. She had testified she had no income, had no money in her own right, and that her mother had no income.

Another witness for respondent, her son, Michael Grasso, testified that he lived with his mother until he was married. He told about the quarrel which his sister described and when asked whether his mother spent the night at home answered: "I wasn't interested enough to remember. I don't know. I don't think that she did." He was six years older than his sister, which makes him about fifteen years old at the time. He said that he did not know who the aggressor was and that the quarrels between his parents were over finances. He stated he did not remember just what his father said although it was bad language. This was in sharp contrast to his sister who was so specific in her recollection of the exact language used although she was but nine years old at the time. This witness admitted that he was biased and on unfriendly terms with his father.

John Grasso, the twin brother of Sarah, was called as a witness for respondent. His testimony as to what happened while his parents were living together was very vague, which he attributed to the fact that it was a long time ago. The vagueness was due to his tender age at the time. He admitted that until two weeks before he testified, he lived with his father; that the libellant had requested him to testify, but that he refused; and finally that he had a fight with his father and left his home. He further confessed that he had

blackened his father's eye, which the libellant showed the master two weeks after the fight. He did not deny that he left home because his father called a policeman and was about to have him arrested. After much evasion, he acknowledged that he and his father quarreled because the parent accused him of stealing from his store and of failing to account for money he received from the rental of his father's truck. The master, therefore, was clearly warranted in disregarding the testimony of the respondent and her witnesses, because of bias and prejudice. Having seen the witnesses and their demeanor, and having heard their testimony, he was a proper judge to pass upon their veracity and credibility, and to appraise their impartiality. The master, in his report, strongly expressed his belief in the testimony of libellant and his witnesses.

The master made, inter alia, the following findings: "5. That the libellant fulfilled his marital obligations and did not provoke the conduct of his wife. 6. That the testimony of the libellant and his corroborating witnesses must be believed in support of his charges and the testimony of the respondent and her witnesses does not impress the master as being genuine. 7. That the respondent was guilty of committing indignities to person of the libellant ...... 9. That there is evidence from which an inference of settled hate and estrangement may be deduced; that the actions on the part of the respondent destroyed the peace of mind of the libellant and the legitimate ends, and objects of matrimony."

"Where an action is heard before a master, we are required to consider the evidence de novo, pass upon its weight and upon the credibility of witnesses, and reach an independent conclusion upon the merits as to whether a legal cause for divorce has been established: *Huston v. Huston,* 130 Pa. Superior Ct. 501, 197 A. 774. And the burden is upon the libellant to prove his case

by a preponderance of clear and satisfactory evidence: *Mayer v. Mayer,* 133 Pa. Superior Ct. 128, 2 A. 2d 37. ......The report of the master, although only advisory and not controlling, is to be given the fullest consideration, particularly as regards the credibility of the witnesses, as he has had the advantage of seeing the parties and hearing the testimony: *Wiley v. Wiley,* 125 Pa. Superior Ct. 547, 549, 190 A. 363; *Golden v. Golden,* 134 Pa. Superior Ct. 211, 2 A. 941.": *Fishman v. Fishman,* 134 Pa. Superior Ct. 217, 4 A. 2d 543.

We have, then, in the instant case, a recital of repeated and long continued indignities inflicted upon the libellant, by his wife, without reason or provocation. His testimony in many of its essential phases was corroborated, not only by competent and disinterested witnesses, but also by circumstances which stamped it as truthful. Many of the incidents averred by the libellant, it is true, were categorically denied by the respondent. The master, however, in the exercise of the functions delegated to him by the court, found, upon ample grounds, that respondent's evidence was biased and unworthy of belief. From the conduct of the respondent, from the statements, accusations and incredible counter-charges made by her, only one logical conclusion can be drawn, that the legitimate ends and objects of matrimony have been destroyed and that this respondent has shown the hate, contempt and settled estrangement necessary to establish a sufficient ground for divorce within the meaning of the law.

The well settled principle, pertinent to the instant case, is declared in *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69, in which it was said, inter alia, at p. 303: "Such indignities, we have frequently said, 'may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest distain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are

not sufficient': *Breene v. Breene,* 76 Pa. Superior Ct. 568; *Koontz v. Koontz,* 97 Pa. Superior Ct. 70; *Sharp v. Sharp* (106 Pa. Superior Ct. 33, 161 A. 453), *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 174 A. 821, 822."

In *Secor v. Secor,* 126 Pa. Superior Ct. 561, 191 A. 647, it was held that where insinuations and charges are made as to a wife's infidelity without foundation, and are persisted in so as to become a course of conduct, they constitute a species of indignities, which, when accompanied by other wilful and humiliating conduct, may be sufficient to warrant a decree of divorce. So, too, unfounded accusations of a wife that her husband ran around with other women and was intimate with his secretary were held sufficient in *Hewitt v. Hewitt,* 136 Pa. Superior Ct. 266, 7 A. 2d 45, to warrant a decree on the ground of indignities rendering the husband's condition intolerable and life burdensome.

We quote from the opinion of the court below: "Our review of the testimony offered by the respondent shows that her testimony tends to confirm and corroborate her husband's story that she heaped indignities upon him. Aside from that, her testimony convinces us that she was not very regardful of the truth; that instead of being moved by a desire to be exact and truthful, she was moved by a vengeful feeling towards her husband which led her to persist in charges that are unfounded. It is difficult for us to see how, in view of all the testimony, the master could have done other than to recommend relief to the husband from an intolerable situation. We believe that the evidence completely establishes that for a long period of time the wife continuously heaped indignities upon her husband, from which he suffered the usual consequences that would make it impossible for him or any other man to continue in marital relationship."

We have read the entire record and carefully considered the very able brief of counsel for appellant. In our independent judgment, however, appellee's ver-

sion of the incidents is sustained by the testimony. We therefore agree with the master and the court below that they amount to indignities rendering his condition intolerable and life burdensome.

The assignments of error are overruled, and the decree of the court below is affirmed.