Statement of Facts—Opinion of the Court. [37 Pa. Superior Ct.

Scott, deceased.  Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ.  Affirmed.

OPINION BY HENDERSON, J., October 12, 1908:

This case involves the same questions decided in the appeal of William W. McBride, administrator, etc., ante, p. 342, in which an opinion has this day been filed.   For the reasons there given the decree in this case is affirmed.

--------

## Russell v. Russell, Appellant.

*Divorce—Cruel and barbarous treatment—Mental suffering—Evidence.*

Any unjustifiable conduct on the part of either the husband or the wife which so grievously wounds the mental feelings of the other, or so utterly destroys the peace of mind of the other as seriously to impair the bodily health or endanger the life of the other, or which utterly destroys the legitimate ends and objects of matrimony constitutes cruelty, although no physical or  personal violence may be inflicted, or even threatened or reasonably apprehended.

To warrant the granting of a divorce on the ground of the conduct on the part of either the husband or wife, as to render the condition of the other party intolerable and life burdensome, where there is no proof of overt bodily harm actually inflicted or threatened, the evidence should be strong and convincing, the course of ill-treatment complained of must have been long continued, and of a serious character.

A divorce will be granted to a wife where the evidence shows that the husband treated the libelant as a menial in the presence of servants, asserted that she was under the influence of designing and wicked persons, circulated reports that she was of unsound mind, kept her by words and actions in constant fear that he intended to resort to legal proceedings to test her sanity and deprive her of her liberty, and generally exercised over her a continual arrogant domination, affecting her health, and rendering her life intolerable and burdensome.

Argued May 7, 1908.  Appeal, No. 202, April T., 1908, by defendant, from decree of C. P. No. 1, Allegheny Co., June T., 1903, No. 459, granting divorce in case of Maria F. Russell, by her next friend, Emma H. Russell, v. Charles T. Russell. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ.  Affirmed.

Libel for divorce.  Before MacFarlane, J.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was decree granting divorce.

*J. McF. Carpenter*, of *Carpenter & Chalfant*, with him *W. M. McJunkin*, for appellant.—Libelant wholly failed to make proof of the facts essential to sustain the decree: Smith v. Smith, 15 Pa. Superior Ct. 366; Middleton v. Middleton, 187 Pa. 612; Richards v. Richards, 37 Pa. 225; Rishel v. Rishel, 24 Pa. Superior Ct. 303; Schulze v. Schulze, 33 Pa. Superior Ct. 325; Smith v. Smith, 19 Phila. 389; Carter v. Carter, 1 Kulp, 359; Roth v. Roth, 15 Pa. Superior Ct. 192.

*S. G. Porter*, with him *L. K. Porter* and *D. F. Patterson*, for appellee.—The indignities need not be such as to endanger life or health; it is sufficient if the course of treatment be of such a character as to render the condition of any woman of ordinary sensibility and delicacy of feeling intolerable and her life burdensome: Krug v. Krug, 22 Pa. Superior Ct. 572.

Opinion by Orlady, J., October 19, 1908:

In the libel filed in this case, it is charged that the defendant offered such indignities to the person of the libelant as to render her condition intolerable and her life a burden, thereby compelling her to withdraw from his home and family.  In the specification of indignities it is alleged that she was treated with disrespect by the defendant in the presence of servants and others; that insulting language was used to her; that the husband circulated reports among her friends to the effect that she was of unsound mind, and other stories that were calculated to affect her character and her right to receive, entertain or visit friends, which stories reflected upon her good name and moral character, and that by words and actions he caused her to fear attempts would be made on his part to have her deprived of her liberty; by reason of which treatment she was kept in bodily fear, her health seriously affected, her condition rendered intolerable and her life was made burdensome.

The case was tried before the court and a jury and resulted

in a verdict in favor of the libelant. A motion for judgment non obstante verdicto was overruled and a judgment was directed to be entered on the verdict, from which the defendant appeals.

After a careful review of the 150 pages of testimony in this case, we are satisfied that the verdict was fully warranted, and was rightly sustained by refusing the defendant's motion. The effect to be given to the verdict in such a case has been so recently considered in Fay v. Fay, 27 Pa. Superior Ct. 328, that it is not necessary to review the authorities therein cited in vindication of that decision. As was said in that case, it is enough for us to say that we have examined the whole body of evidence in the light of the general principles relative to this cause for divorce, and whilst it is conflicting in many particulars we are constrained to the conclusion that the testimony of the libelant and her witnesses, if believed by the jury, was sufficient to warrant them in finding the facts essential to a lawful dissolution of the marriage tie. Here our duty ends so far as the evidence is concerned.

The learned trial judge instructed the jury, that they were to be satisfied, by the strength of the evidence, that such personal indignities were put upon her, from time to time, continuously—not occasionally—but continuously, so as to render her condition intolerable and life burdensome, and forced her to remove from her husband's home. Which thought was repeated several times in the charge. And further, that the intolerable conditions and burdens which compelled her to withdraw, must not be on account of her own faults, her own stubbornness, intellectually or otherwise.

The appellant urges that it was error to submit the case to the jury in the first instance, and second, that the court erred in the general charge. In the two excerpts taken, which represent the first and second assignments of error, the complete thought of the trial judge is not fully set out, and these excerpts, taken in connection with the fair and lucid explanation which precedes and follows them, satisfies us that the charge of the court, taken as a whole, was fair and adequate, and that it was fully understood by the jury.

In an analysis of the testimony it is quite difficult to under-
stand the view of the respondent in regard to his duty as a hus-
band to his wife. From his standpoint, he doubtless felt that
his rights as a husband were radically different from the stand-
ards imposed upon him by the law and recognized by all the
courts of this country. He stated to his wife, "I can show you
a thousand women that would be glad to be in your place and
that would know my wishes and do them." His estimation of
his own importance is gathered from his statement to a friend:
"I have been approached twice by parties who contemplate
the organization of a large bank in Pittsburg, with a capital of
three million dollars, and have been solicited to permit my
name to be used in connection with the organization as its
prospective president," and to another friend, "After reading
'The Plan of the Ages' people say, Brother Russel is great! I
will go to Allegheny and be near this great man! When they
get to Allegheny they find Brother Russel makes no claim to
greatness, and merely claims that it is God's word that is won-
derful. He reasons the matter to them as though it were a
question in mathematics; and when they hear the answer, they
say, 'how simple,'" and many like expressions of self-esteem
pervade his testimony. Letters to friends furnish some idea
of his own estimation of his character. He repeatedly states
that he is not self-conceited, but meek and not boastful, and
writes that two phrenologists had examined his head and as-
sured him that he was deficient in self-esteem. From his whole
testimony, it would seem that he was right in reaching the con-
clusion stated by him in a letter to his wife, to wit: "I conclude
that I am adapted to no one, and that no one is adapted to me,
except the Lord. I am thankful that He and I understood each
other and have confidence in each other. The last month has
fastened the conviction upon me much against my will. I am
convinced that our difficulty is a growing one generally—that
it is a great mistake for strong-minded men and women to
marry."

From this view point his conduct is at least consistent, and
he would naturally feel warranted in feeling that any doubt as
to the correctness of his views or conclusions, would be due to

plots and schemes on the part of his wife; that his wife was a blasphemer, or as he stated it, "One of two things is certain, either my wife has become mentally unbalanced, or else she has become possessed of a most wicked spirit."

It is apparent from the testimony of each, that each had strong convictions as to the correct interpretation of the Holy Scriptures. They were engaged in the publication of a newspaper called "Zion's Watch Tower," and the "Millennial Dawn," the "Watch Tower Bible," tracts and pamphlets.

His course of conduct toward his wife evidenced such insistent egotism and extravagant self-praise that it would be manifest to the jury that his conduct towards her was one of continual arrogant domination, that would necessarily render the life of any sensitive Christian woman a burden and make her condition intolerable. The indignities offered to her in treating her as a menial in the presence of servants, intimating that she was of unsound mind, and that she was under the influence of designing and wicked persons fully warranted her withdrawal from his house, and justified her fear that he intended to further humiliate her by a threat to resort to legal proceedings to test her sanity. There is not a syllable in the testimony to justify his repeated aspersions on her character or her mental condition, nor does he intimate in any way that there was any cause for difference between them, other than that she did not agree with him in his views of life and methods of conducting their business. He says himself that she is a woman of high intellectual qualities and of perfect moral character. While he denied, in a general way, that he attempted to belittle his wife as she claimed, the general effect of his own testimony is a strong confirmation of her allegations.

In Butler v. Butler, 1 Parsons' Select Equity Cases, 329, decided in 1849, after a careful review of precedent authorities, Judge KING says, "A husband may by a course of humiliating insults and annoyances practiced in various forms which ingenious malice could readily devise, eventually destroy the life or health of his wife, although such conduct may be unaccompanied by violence, positive or threatened. Would a wife have no remedy in such circumstances, under our divorce

laws, because actual or threatened personal violence formed no element in such cruelty? The answer to this question seems free from difficulty when the subject is considered with reference to the principles on which the divorce for cruelty are predicated.

The courts intervene to dissolve the marriage bond for the conservation of the life or health of the wife endangered by the treatment of the husband. The cruelty is judged from its effects, not solely from the means by which those effects are produced. To hold absolutely that if a husband avoids positive or threatened personal violence that a wife has no legal protection against any means short of those which he may resort to, and which may destroy her life or health, is to invite such a system of infliction by the indemnity given the wrongdoer. The more rational application of the doctrine of cruelty is to consider a course of marital unkindness with reference to the effect it must necessarily produce on the life or health of the wife, and if it has been such as affect or injure either to regard it as true legal cruelty. This doctrine seems to have been in the view of Sir H. Zeimer Just in Dysart v. Dysart, when he stated that he deduces as an inference from what Sir William Scott ruled in Evans v. Evans, that, "If austerity of temper, petulance of manner, rudeness of language, a want of civil attention, occasional sallies of passion, do threaten bodily harm, they do amount to a legal cruelty." This idea as expressed axiomatically would be no less than the assertion of this principle; that whatever form marital ill-treatment assumes if a continuity of it involves the life or health of the wife, it is legal cruelty."

While the early rule as announced in England and in some of the American states, was, that mental suffering, distress or injury, and bodily injury resulting from mental suffering were insufficient to constitute cruelty, yet the modern and better considered cases have repudiated this doctrine as taking too low and sensual a view of the marriage relation, and it is now very generally held, and has always been the rule in Pennsylvania, that any unjustifiable conduct on the part of either the husband or the wife which so grievously wounds the mental

feelings of the other, or so utterly destroys the peace of mind of the other as seriously to impair the bodily health or endanger the life of the other, or which utterly destroys the legitimate ends and objects of matrimony constitute cruelty, although no physical or personal violence may be inflicted, or even threatened or reasonably apprehended: May v. May, 62 Pa. 206; Jones v. Jones, 66 Pa. 494; McMahen v. McMahen, 186 Pa. 485; Howe v. Howe, 16 Pa. Superior Ct. 193; Schulze v. Schulze, 33 Pa. Superior Ct. 325; Fay v. Fay, 27 Pa. Superior Ct. 328; Barnsdall v. Barnsdall, 171 Pa. 625. To warrant the granting of a divorce on the ground of the conduct on the part of either the husband or wife, as to render the condition of the other party intolerable and life burdensome, where there is no proof of overt bodily harm actually inflicted or threatened, the evidence should be strong and convincing, the course of ill-treatment complained of must have been long continued, and of a serious character. The conditions exacted by these decisions, have been fully and clearly met by the libelant, and the proof adduced by her on the trial fully warranted the verdict rendered. No error being found in the record the assignments of error are overruled and the judgment is affirmed.