## Breed, Appellant, *v.* Breed.

*Divorce—Indignities to the person—Report of master—Insufficient grounds for divorce.*

Where, in an action for divorce because of indignities to the person, the master reports, "the case is not strong in the opinion of the master; but as respondent has entered no appearance, it shows that she does not intend to deny the allegations. Also, when we consider that mere desertion for two years will give sure cause for divorce, and the master believing that when parties have become so estranged as to get into the divorce court, they seldom come together again in the spirit of love and affection that should be inseparable from the marriage relation; therefore, in the interests of good order and morality, the master resolves a doubtful question in favor of the libellant's position," and there is no evidence of actual indignities to the person of the libellant, the action of the lower court in refusing to enter a decree of divorce will be affirmed.

Argued April 16, 1919. Appeal, No. 146, April T., 1919, by libellant, from order of C. P. Crawford Co., September T., 1918, No. 88, refusing divorce in the case of Ernest Mark Breed v. Irene Bell Breed. Before OR-LADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, WILLIAMS and KELLER, JJ. Affirmed.

Libel in divorce. Before PRATHER, P. J.

The facts stated in the opinion of the Superior Court.

The case was referred to B. B. Pickett, Esq., Master, who recommended a divorce for the reasons quoted in the opinion of the Superior Court. Subsequently the court entered a decree refusing to grant a divorce. Libellant appealed.

*Error assigned* was the order of the court.

*Otto Kohler,* for appellant.

No appearance and no paper-book for appellee.

OPINION BY PORTER, J., October 13, 1919:

The ground upon which the appellant in his libel avers his right to a divorce from the bonds of matrimony is that the respondent "hath offered such indignities to the person of libellant as to render his condition intolerable and life a burden, thereby compelling him to withdraw from her home and family." The court below referred the proceeding to a master who filed a report recommending that the prayer of the petitioner be granted and a divorce be decreed as prayed for. The court below, after consideration of the evidence, refused to enter a decree of divorce and dismissed the libel, from which decree the libellant appeals.

The able counsel representing the appellant argues that the recommendation of the master should have the same effect as a special finding of fact by a jury, and the court should not be permitted to avoid it or set it aside except for error. This is not the rule in actions for divorce. The report of the master is merely advisory, and does not relieve the court of common pleas nor this court from the duty of conscientiously considering the evidence and determining whether it establishes the facts which entitled libellant to a divorce for the very cause alleged in the libel. While the master in the present case recommended a decree of divorce he thus states the grounds upon which he founds his recommendation: "The case is not strong in the opinion of the master; but as respondent has entered no appearance, it shows that she does not intend to deny the allegations. Also when we consider that mere desertion for two years will give sure cause for divorce, and the master believing that when parties have become so estranged as to get into the divorce court, they seldom come together again in the spirit of love and affection that should be inseparable from the marriage relation, therefore in the interests of good order and morality, the master resolves a doubtful question in favor of the libellant's position." Divorces are not to be granted upon any such grounds. There is

no presumption that because parties have gotten into the divorce court they are entitled to the relief which they seek, nor has the Commonwealth undertaken to insure against the accident of the absence of that affection which ought to be inseparable from the marriage relation.

The parties to this proceeding were married on May 23, 1917, and lived together at the house of the libellant's father and mother, in Meadville, until September 25, 1917, when they removed to Pittsburgh, where the libellant was pursuing the study of dentistry at the university. They lived in an apartment in Pittsburgh, doing light housekeeping, until January 25, 1918. The libellant testified that he had then arranged to have his wife go to Meadville and stay with libellant's father and mother, until he could complete his studies. She went to his father's where she remained about three weeks, and then went to live with her mother, in the same City of Meadville. The libellant visited Meadville at Easter time for a few days, during which he stayed at his father's residence, while his wife was with her mother, but there is nothing in the evidence to indicate that their relations were at that time other than entirely amicable. On June 17, 1918, the libellant returned to his father's house at Meadville and invited his wife to join him there, while she insisted upon his going and living with her at the house of her mother. They settled the matter by renting an apartment in Meadville and going to housekeeping upon their own account, some time in the latter part of June, and continued keeping house there until July 13, 1918, when the appellant left his wife and has not lived with her since. He filed this libel on July 15, 1918. It is important here to observe that these parties only lived together from the 23d of May, 1917, to January 25, 1918, from the latter date, in pursuance of an arrangement which the libellant testified he had made, the respondent lived in Meadville while the libellant was pursuing his studies in Pittsburgh, until the latter part of June, 1918, when they again went to housekeeping and lived together

for two or three weeks, when the libellant left the respondent. During the short period they lived together in the latter part of June and early in July, 1918, the only misconduct of the respondent to which the libellant testified was as follows: "While we lived together on North Main street I was most often compelled to get my own meals. Several times I brought food to our house which my mother gave me. Mrs. Breed (the respondent) paid no attention to the family washing. My bed clothing had not been changed and became so dirty that I had to see to having it washed myself. We had different beds. Mrs. Breed declined to share my room with me." This is the sum total of the appellant's complaint of the conduct of the respondent during the brief period that they were finally living together. There is nothing in it, conceding it all to be true, which would warrant a finding that the wife had during this period offered any indignities to the person of the libellant. There is nothing in the statutes of Pennsylvania which imposes upon a young wife the penalty of being divorced because she is not a good cook, or laundress, or a careful housekeeper, nor do the statutes confer jurisdiction upon the courts to grant a divorce because a wife refuses to occupy the same bed with her husband. The libellant in his testimony seems to have carefully refrained from stating that there had been a child born as the fruit of this marriage. His mother testified, however, that libellant expected to be called into the military service and wanted his wife and baby to be with his (libellant's) father and mother. It thus appears that the respondent had a young baby, which may account for her failure to become a model housekeeper, for the evidence does not indicate that she had any servant. There is nothing in the evidence whatever from which it could be inferred that the respondent had offered any indignity to the person of the libellant during the period between the 25th of January and the 13th of July, when he left her. During the earlier period, from May 23, 1917, to January 25, 1918, while they were living to-

gether the libellant testified to four or five occasions upon which his wife became very angry. The first was in August, 1917, when she wished to go with her mother to Edinboro for a day. He protested against her going, but she, notwithstanding, went with her mother, returning the same evening. It appears from his own testimony that even if she had remained at the house of his father during that day she would not have had the pleasure of his company, for he was busy doing dental work at the office of Doctor Boyd. When she returned the mother of the libellant told her that her first duty was to her husband and that she could not be happy if she would do as her mother wanted and not as her husband desired, whereupon the respondent again became angry and said if she had it to do again she would do the same thing over again. Another occasion upon which they had quarreled was while they were living in Pittsburgh and were visited by the mother of the respondent and the sister of the libellant, when the libellant discovered that the bed in which his mother-in-law slept had more covering upon it than that in which his sister slept and thereupon remonstrated with respondent, saying that he thought his sister was entitled to as much consideration as his mother-in-law, whereupon the respondent became angry. The other occasions upon which the parties quarreled were of a kindred nature and accompanied by like trivial results. The libellant testified that the respondent had a very violent temper. "When she was angry she simply worked herself into a frenzy. At times she became so violent that she would jump up and down throwing up her hands." A husband is not entitled to a divorce because his wife has a violent temper, unless it leads her to say things and do things which amount to indignities to his person. There is in this evidence nothing to indicate that the respondent offered any violence to the libellant, nor that even when angry, she made any threat of violence, nor that she made any accusations against him, nor uttered insulting words, nor said in the presence of any strangers

anything tending to humiliate him. The libellant and his witnesses expressed the opinion that when the respondent was angry she became violent, but that is only their opinion. The witnesses should have been called upon to state what the respondent had said and done during her fits of anger; it is for the court, not for the witnesses, to determine whether her words and acts constitute indignities to the person of libellant. This young couple may have made a mistake in entering into the marriage relation, it is possible that each of them is now willing to have the tie dissolved, but the legislature has not authorized the courts to make Pennsylvania a haven where all sorts of matrimonial discontent shall find sur cease of sorrow.

The decree is affirmed and the appeal dismissed at cost of the appellant.