## Zonies *v.* Zonies, Appellant.

Argued October 13, 1942.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, RHODES, HIRT and KENWORTHEY, JJ.

*Simon Pearl,* with him *Henry Arronson* and *I. Louis Rubin,* for appellant.

*Harry Shapiro,* with him *S. Walter Foulkrod, Jr.,* for appellee.

OPINION BY KENWORTHEY, J., January 28, 1943:

This is an action of divorce brought by the husband, alleging cruel and barbarous treatment and indignities to the person. Testimony was taken before a master, who recommended a divorce on both grounds. Respondent filed exceptions, which were dismissed by the court and a final decree was entered. Respondent appeals.

The parties were twenty years of age when they married on April 14, 1915. They resided and cohabited together as husband and wife, except for a short period of separation in 1932, until April 5, 1936. Three children were born; the youngest was sixteen, the oldest twenty-four at the time of the first hearing in 1940. They continued to live with the mother after the final separation, libellant paying the rent and supporting the family as well as giving the son and oldest daughter an allowance which sometimes took the form of a salary. In 1938 the oldest daughter married, in 1939 the son also left his mother to live at the dormitory of the Philadelphia College of Pharmacy & Science where he was a student.

The testimony is voluminous — over eleven hundred pages — and conflicting, but a careful examination of it satisfies us that the material facts are as follows: After the marriage, libellant, a pharmacist, opened a drugstore and established his residence on the floors above the store. From the beginning, respondent showed a lack of normal interest in her household affairs. There was constant bickering. Respondent refused to have anything to do with the store or wait on any customers, forcing libellant on one occasion to

close it in order to deliver a prescription. Throughout the entire marriage, respondent referred to libellant as a "kike," "bastard," "loafer," "whoremaster," "runaround," "playboy," and "good-for-nothing." These offensive designations were hurled at libellant not only in the presence of his children, but in the presence of relatives, strangers, friends, customers and employes. Repeatedly, falsely and without provocation, she accused him of immorality with other women. These accusations were made publicly. Hysterical rages, accompanied by the throwing of dishes and other objects at libellant, were frequent. These occurrences took place openly in the store, at home and in the houses of relatives. Many times respondent remained away from home until three a. m., the only explanation offered being a vituperative "If you don't like it, you can get the hell out of here." Without modesty or shame, she paraded in the prescription portion of the store scantily dressed in a kimona. Frequently she went to bed with her clothes on, refusing libellant's admittedly modest sexual demands. "Go down town and buy it" was her favorite expression, coupled with a tendency to lock herself in, and her husband out of, the bedroom. Twice without cause, she threatened to kill libellant, producing a large bread knife which she had hidden beneath her pillow, and on one occasion drove libellant frantic with fear that their daughter, then about five years old, was lost when she told the nurse to stay away with the child until midnight. When she first became pregnant, she threatened to kill libellant and the child. She alienated her own and libellant's friends by her indifference and incivility. When libellant left her in 1932, she induced him to return with promises of reform which proved empty. Libellant was compelled to consult physicians about his health.

In many particulars, libellant's testimony is corroborated by libellant's brother and sister, former em-

ployes, disinterested physicians, friends, and damaging admissions of the son, daughter and respondent.

Respondent categorically denied all the charges, but her testimony was contradictory and evasive in important matters; taking it in its entirety, it lacked credibility. Her false accusations of immorality with other women were conclusively shown from her own testimony in spite of her feeble attempts to explain that she merely accused him of "running around" by which she meant reference to his frequent attendance at fraternal and professional meetings. More significant than anything in the entire record are the innuendoes, accusations of immorality and offensive language written by her to libellant after the final separation in 1936. "Big shot"; "You certainly must be a Prize A druggist"; "Boy how you must have lied to get into that club, only the Lord knows"; "Man about town"; "Shuman says when a kike gets around 40 and has a little money he must have his fling"; "So even that far back (1931) you were running around"; "So the blind date wanted chicken sandwiches"; "Knowing how good you are to blondes and strangers"; "the whores taking you at your word"; "Do you still walk one-half way round after you have seated the whore to get in (your automobile)?"; "You must know by now how mean wives can be"; "You wanted to take your pleasures with other women. It was your own choice"; "Poor perverted thing"; are but brief excerpts.

This evidence sheds a brilliant light on respondent's behavior pattern *(Hewitt v. Hewitt,* 136 Pa. Superior Ct. 266, 7 A. (2d) 45, *Campbell v. Campbell,* 126 Pa. Superior Ct. 190, 190 A. 536), and has been of immense value to us in our search for the truth. We have read these communications in their entirety as requested by respondent's counsel and we fail to come to the conclusion that they were provoked or incited by libellant. See *Aikens v. Aikens,* 57 Pa. Superior Ct. 424. Nor are

they explained by libellant's boasting, a charge which was totally unproven. See *Russell v. Russell*, 37 Pa. Superior Ct. 348.

The "corroboration" offered by respondent was of little value. Several friends testified that the condition of the household was excellent and that libellant was cool and disdainful toward her. This testimony, for the most part, represented their opinion. See *Edmond's Appeal*, 57 Pa. 232. The daughter testified the quarrels between the parties which admittedly occurred were usually provoked by libellant. Her testimony indicated that this, too, largely represented her opinion; when she attempted to implement her evidence with a citation of specific instances it was shown that on many of them she was not at home. And although she tacitly admitted that respondent frequently accused libellant of "running around," she emulated respondent's attempted explanation that respondent only meant staying out late. The weight of the testimony of the son was very much weakened by the production of a letter written by him to libellant in 1939.

Admittedly libellant was a hard working, upright individual who was devoted to his children and contributed well to the support of his family. No evidence, which merits attention, of any immorality was shown. We think the master was correct in discounting the credibility of respondent's daughter and son in the face of the contradictions and impeachments. The master had the advantage of seeing their reactions and demeanor and we would not lightly disturb his findings. *Lyons v. Lyons*, 116 Pa. Superior Ct. 385, 176 A. 792.

In our opinion, libellant has shown a clear case of indignities. See *Sleight v. Sleight*, 119 Pa. Superior Ct. 300, 181 A. 69; *Golden v. Golden*, 134 Pa. Superior Ct. 211, 3 A. (2d) 941.

Although we have considered the evidence of physical violence and threats to life in reaching our conclusion

that the charge of indignities was made out *(Sarbiewski v. Sarbiewski,* 127 Pa. Superior Ct. 463, 193 A. 91; *Miller v. Miller,* 143 Pa. Superior Ct. 534, 17 A. (2d) 910), we do not think it sufficient to establish the charge of cruel and barbarous treatment. *Presutti v. Presutti,* 146 Pa. Superior Ct. 41, 21 A. (2d) 427.

The decree is affirmed on the ground of indignities, costs to be paid by appellant.