Bobst *v.* Bobst, Appellant.

Argued November 13, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Everett Kent,* with him, *A. E. Hurshman,* for appellant.

*Charles D. Smeltzer,* for appellee.

OPINION BY RENO, J., March 4, 1947:

The court below approved the report of the master, and decreed a divorce upon the husband's charge of indignities.

Although duly notified, the respondent did not appear, nor was she represented, at the master's original hearing. After she received notice of the master's report recommending the decree and the final rule, she petitioned the court to reopen the case and permit her to enter a defense. Several causes, illness, imprudent advice, and her own conviction that her husband's case was without merit and would not support a divorce—the last was doubtless the moving reason—were responsible for her omission to appear earlier. The case was reopened, and when her side of the case was heard, the master and the learned judge who entered the final decree sat together.

Our conclusion based upon our independent and protracted study of the voluminous typewritten record is that the decree must be reversed. The difference between our conclusion and that reached by the court below represents our disapproval of its inadmissible mode of approaching the respondent's testimony. Neither the master nor the court impeached the credibility of respondent or her witnesses because of their demeanor. In fact, the master found that "the Respondent is a woman of merit and good character, and her family are

loyal and upstanding". Nevertheless, they refused to give weight to their testimony. The court quoted with approval the master's report: "There were denials of the allegations made by the Libellant at the original Master's hearing. However, they were negative and your Master was not impressed by the nature of their testimony." This was fundamental error, and by it they precluded themselves from giving respondent's case the weight to which it was entitled.

A denial, categorical, specific or otherwise, is not negative testimony. In form it is a negation, but in substance it is positive testimony; it is an affirmation that the testimony of an opponent is false; and that the event to which he or his witnesses testified did not happen. The distinction between positive and negative testimony is this: "Evidence is positive where the witness states that a certain thing did or did not happen or exist, and negative where the witness states that he did not see or know of the happening or existence of a circumstance or fact": 31 C. J. S., Evidence, §2. Even negative testimony is not to be rejected out of hand. 2 Wigmore on Evidence, §664. Cf. *Kindt v. Reading Co.*, 352 Pa. 419, 43 A. 2d 145. This primary mistake caused the ultimate error. No rule has securer footing than that "the testimony of the husband, *denied and contradicted* by the wife, (as in this case) cannot be regarded as creating more than a doubtful balance of evidence. When such a situation occurs the libellant fails to make out a clear and satisfactory case": *Esenwein v. Esenwein*, 105 Pa. Superior Ct. 261, 263, 161 A. 425, affirmed 312 Pa. 77, 167 A. 350. (Emphasis added). That principle governs this case.

For an undisclosed reason the court did not discuss, and apparently did not weigh, respondent's evidence of the charges she and her witnesses made against libellant. Many are flagrant, and although libellant was present while respondent and her witnesses testified, he did not contradict them. Triers of fact are not required to believe uncontradicted testimony, but the absence of con-

tradiction is always significant, especially in divorce cases. A libellant can have a divorce only if he is an innocent party, and if he chooses to permit serious charges to remain in the record without contradiction we are warranted in accepting the testimony as true, especially where the credibility of the witnesses has not been questioned. The master, in a feat of understatement, found that "some of his [libellant's] actions were not desirable", and we assume that he believed, as we certainly do, respondent's witnesses.

The parties were married in 1927. He was then 26 years old, a graduate of a noted college and divinity school, and a clergyman with a charge in Philadelphia. She was 25 years old, a graduate of a teacher's college, a teacher in public and Sunday schools in Northampton County. They were members of the same denomination, and met at a church conference in her home town of Bangor. During her married life she sang in the choir and taught in her husband's Sunday School. If a common faith, similar cultural backgrounds, equal social standards, and mutual interest in a common cause can produce marital happiness, their future was bright with promise. They lived together until 1944; yet if libellant's unchivalrous exposure of the whispered intimacies of the connubial chamber were authentic, the marriage was wrecked in its first six months. This he called "the seat" of the trouble between them. It has never dawned upon him that at that very moment she was bearing within her the evidence which, fructifying by the birth of a daughter six months later, irrefragably refuted his apocryphal revelation. His disclosure is spurious, and even were it true, sexual mismating is not an indignity nor a ground for divorce. *Conrad v. Conrad,* 112 Pa. Superior Ct. 198, 170 A. 342. Nor has the law "set up standards for dissolving those [marriages] which are mistakes", as the master erroneously assumed. The divorce courts cannot rectify misalliances; they dissolve only those marriages which have produced results which

the legislature has recognized as grounds for divorce. *Gordon v. Gordon,* 48 Pa. 226; *Breed v. Breed,* 73 Pa. Superior Ct. 9.

We shall not attempt to mention, much less discuss, all the incidents related in this bulky record. Some are trivial in themselves, and when added together amount only to the friction engendered by and almost inseparable from the married state. *Conrad v. Conrad,* supra. They have been satisfactorily explained, or denied. Others bear upon their face the badge of inherent improbability. Our review will be limited to an examination of several episodes to which the master and the court attached unusual significance.

According to libellant's testimony, "the basic, underlying difficulty" was that "she thought that I was more friendly with folk of the opposite sex than I should be." To the master's question: "Are you of a jealous nature?" she answered frankly: "To the extent of keeping my husband and keeping his reputation as a good minister." The record amply justifies her answer. Time and again she admonished him concerning his close association with women of the congregation which, whether innocent or not, was clearly above and beyond the line of his professional duty. The record is replete with incidents, none denied by libellant, which would naturally arouse the suspicions of any just woman, and move a good woman to guard her husband against their consequences. The purpose of this opinion is to decide the case without injuring libellant in his profession, and no good end would be accomplished by detailing the conduct which establishes firm basis for his wife's solicitous regard for his reputation. This court has long held that where reasonable grounds for suspicion exist, admonitions and even charges of undue intimacy made in good faith, are not indignities. *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 174 A. 821; *Abbott v. Abbott,* 75 Pa. Superior Ct. 483. Cf. *Ponthus v. Ponthus,* 66 Pa. Superior Ct. 257.

Possibly the most important episode is libellant's charge that at supper, in the presence of his children, respondent served him with stewed rhubarb containing ground glass. Everyone knows that sugar in stewed rhubarb tends to crystallize, and resembles a glassy substance. Even libellant testified that at first he thought he had bit a lump of sugar, and only his wife's confession, still in the presence of the children, convinced him that the substance was glass. Of course she completely denies the occurrence, and even without the denial, the story will not bear rational analysis. To suppose that a woman of intelligence, to say nothing of a woman of good character, would in the presence of her children, then old enough to be witnesses against her, administer a hidden lethal substance to her husband is to war upon logic and human experience. Triers of fact are not required to accept as judges what they would reject as men, and we cannot accept this utterly fantastic tale.

Starting five years after the marriage, libellant began collating notes of his wife's derelictions against the contingency of a divorce. He exhibited them to the master at the hearing and from them he purported to refresh his recollection. Something can be said about a man who spends ten years of his life compiling an index of his grievances, but the potent point is: How did it happen that a man who was diligently collecting evidence against his wife, did not preserve the ground glass and the rhubarb as autoptic testimony of her criminal assault upon him?

The court found, notwithstanding her vigorous denials, "that the respondent made it a practice to talk all through the church services; that she laughed loud enough for people around her to hear her laughter; that she would blow her nose vigorously and regularly while her husband was preaching and when he was leading in prayers; that she stuck her fingers up at her nose at him as he walked out of the church at the conclusion of the services". There was testimony supporting that finding;

one of libellant's extravagantly enthusiastic witnesses testified that respondent thumbed her nose at libellant at most every Wednesday night prayer meeting for *five or six years!* The preponderance of the evidence coming from her witnesses who were also present at the services and saw respondent is that the odious conduct never occurred. Congregational chit-chat concentrated for centuries upon the preacher's wife, her dress, her manners, her housekeeping, and her congregational activities, has slight, if any, probative value. How significant it is, is illustrated by this record. According to one of *libellant's* witnesses, when the final rupture came "there was a distinct division between the members of the church", some for and some against the pastor, and he was not reappointed for the following year. But the complete answer is that there is not a particle of evidence that these actions had ever been reported to libellant, and consequently even if the evidence were true, they lack the prime requisite of indignities, for they could not have made his life burdensome or his condition intolerable. *Wark v. Wark*, 73 Pa. Superior Ct. 274.

This is a melancholy case and its most poignant feature is reached in the testimony of respondent and her witnesses. One searches in vain in the libellant's testimony for an instance where he spoke to his wife about their difficulties, made one kindly and conciliatory advance, and sought earnestly an understanding and adjustment of their differnces by which forgetfulness and complete unity would supplant the threatened estrangement. Instead of seeking peace, he was brooding upon and taking notes of his imaginary grievances. On the contrary, respondent's testimony breathes constantly her unfaltering love for him, and her repeated passionate pleas for restoration of happiness. To all this he turned a deaf ear; "something snapped in my head", he said; and the claims of his children, his position in the church, the ardent appeal of his father-in-law availed nothing. But more devastating is the testimony of the vice-

348

president of his church. He testified that when a committee of the board of trustees interviewed him, libellant "refused to have anything to do with the woman, he is through." The committee also conferred with her, and the vice-president testified: "When we spoke to her, she was willing to do anything for a reconciliation, for the benefit of the church and her children."

Before the law all men are equal, and all men are judged by the same law. There is not one law for ministers and another for laymen. Yet in the divorce courts we deal with personalities, and their reaction with others. A charge of indignities requires an examination of behavior, and in determining what constitutes indignities courts keep in view the parties' moral preceptions, their ethical professions, their characters, their backgrounds, their social status, and even their station in life. *Richards v. Richards,* 37 Pa. 225; *English v. English,* 19 Pa. Superior Ct. 586; *Aikens v. Aikens,* 57 Pa. Superior Ct. 424; *Breene v. Breene,* 76 Pa. Superior Ct. 568. Not so long ago Judge, afterwards Mr. Justice, PARKER, speaking for this court, in the case of a businessman said, "if he had displayed the same industry and tact in his home life that he did in his business, the result would have been different": *Kerr v. Kerr,* 115 Pa. Superior Ct. 18, 22, 174 A. 820. It is our duty to decide cases, not to advise litigants, but this testimony convinces us that had libellant employed the means at his command as a minister he could have saved his marriage and his happiness. If his wife was guilty of actions which called for forgiveness, and we find no evidence of any major offense, he was vicar of a Master who commanded forgiveness, and he would not. All of us have carefully studied the testimony, and we are all of opinion that libellant failed to prove a satisfactory case.

Decree reversed and libel dismissed.