Konosa *v.* Konosa, Appellant.

Argued March 24, 1949. Before RHODES, P. J., HIRT, RENO, DITHRICH, ARNOLD and FINE, JJ. (ROSS, J., absent).

*J. Charles Short,* with him *Davis & Short,* for appellant.

*Wm. F. Berkowitz,* for appellee.

OPINION BY RENO, J., July 15, 1949:

This is a divorce action in which the husband's libel charges cruelty, indignities and desertion. The master recommended dismissal of two grounds and reported that indignities had been established. The court below adopted the master's findings of fact and conclusions and granted the divorce.

The parties were married in 1915 and lived together continuously until 1940. Five children were born of the union. During their marital life they resided in five different homes, all of which were in Manayunk, Philadelphia. Both parties are of Polish extraction although respondent was born in this country. Libellant testified through an interpreter because of his difficulty with the English language.

For the most part the testimony is general in nature and indefinite as to time. We have attempted to fix the occurrences in a chronological order.

If we are to believe libellant's testimony this dissension commenced in 1917 when respondent refused to do anything he asked of her. When their son Edward, who was born in 1917, was one year old, respondent threatened to kill him with a table knife.[1] After libellant

---

[1] In the bill of particulars it was alleged that the indignities commenced in May, 1920, and that this particular incident occurred about July 1, 1922.

restrained her she went to her mother's home and libellant asked his sister to come and take care of the children. Respondent then publicly accused libellant and his sister of living together as husband and wife. From 1922 to 1927 respondent constantly fought with the neighbors and if libellant attempted to interfere she would throw things at him and say he was "the same son of a bitch as they are". In August, 1927 respondent became hysterical and a doctor was called. In order to administer medicine the doctor was compelled to use force. When libellant asked her why she had refused the medicine she threw garbage at him. After 1933 respondent made weekly visits to taprooms, often taking the children with her. She placed dirty socks in his lunch box and used his clean towels to wipe the kitchen stove. Since 1938 respondent has refused to prepare her husband's meals or wash his clothes. When libellant would ask the children to do something, respondent would say "Don't listen to him. The hell with him." Apparently respondent had a habit of taking members of her family in court upon the slightest pretext. In 1921 when libellant asked her why she did this her reply was "I will smack you in the face. I will take you into court." Libellant also testified she took their son Edward to court when he was sixteen years old because he had a quarrel with a little girl. She had this same son before a magistrate again in 1939 because he called her "a crook and a son of a b". She had the daughter in court for running around and going out at night. On July 12, 1940 libellant left the home when respondent threw his clothes out and told him to "Go away, you stinking bastard. Give the place for somebody else."

Indignities cannot be defined generally but must depend upon the particular circumstances of each individual case and the position in life, character and disposition of the parties. It is well recognized as a course

of conduct which is humiliating and degrading to the innocent, injured spouse. Vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement are all evidence of indignities. *McKrell v. McKrell,* 352 Pa. 173, 42 A. 2d 609; *McKee v. McKee,* 159 Pa. Superior Ct. 233, 48 A. 2d 4; *Deutsch v. Deutsch,* 141 Pa. Superior Ct. 339, 14 A. 2d 586.

Respondent denied all the material accusations. She admitted that during a "scrap" they would both engage in some name calling. The important contradiction in respondent's testimony was her denial that she ever called libellant a "greenhorn" which she subsequently admitted calling him once in a while. Respondent testified she had several operations and had been diabetic since 1937. When confined to bed libellant refused even to bring her a glass of water. She testified that a few years after they were married libellant kicked her down the stairs and at the time she was pregnant and libellant said the baby did not belong to him and that their other child was the milkman's. During depression years when libellant was unemployed respondent and the children purchased peanuts and candy with relief money and sold them at the movies and at ball parks. She contended that libellant tormented her, hit her, indecently exposed himself, and refused to properly support her. In 1940 she had libellant in court because he was only giving her $5.00 a week. The court ordered him to pay $8.00 a week for her support and that of their youngest child. Two days after the court order libellant left home. This action was brought six years later.

The case turns upon the credibility of the parties and their witnesses, and its decision must finally rest upon the resolution of that question. The master recognized the obligation which the decisive conflict of the testimony cast upon him. In his able report he care-

fully analyzed the testimony and stated adequate reasons which moved him to find truth in libellant's testimony and to accept his version of the marital life of the parties. With opportunity to observe the demeanor, of the witness denied to us, we cannot assert that his appraisement of credibility was erroneous. His finding of credibility, approved by the court below, is entitled to the fullest consideration. *Fulton v. Fulton*, 142 Pa. Superior Ct. 512, 17 A. 2d 222; *Smith v. Smith*, 157 Pa. Superior Ct. 582, 43 A. 2d 371; *Bobst v. Bobst*, 357 Pa. 441, 54 A. 2d 898. Relying upon his judgment of credibility and the approval of it by the court below, we have studied all the testimony in that light, and our independent assessment of its probative value has confirmed the conclusions reached by the master and President Judge GORDON.

Affirmed.